Paul A. Kampmeier (WSBA #31560)
Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
Tel: (206) 223-4088 x 4
paul@kampmeierknutsen.com

Allison LaPlante (Oregon State Bar #023614)
***Pro hac vice* application forthcoming**
Earthrise Law Center
Lewis & Clark Law School
10015 S.W. Terwilliger Blvd.
Portland, OR 97219
Tel: (503) 768-6894
laplante@lclark.edu

*Attorneys for Plaintiff Northwest Environmental Advocates*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, an Oregon non-profit corporation, | Case No. |
| Plaintiff, | COMPLAINT |
| v. | |
| THE U.S. DEPARTMENT OF COMMERCE, THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, and THE U.S. ENVIRONMENTAL PROTECTION AGENCY, agencies of the United States of America, | |
| Defendants. | |

## I.    INTRODUCTION

1.    This is an action against the U.S. Department of Commerce, the National Oceanic and Atmospheric Administration (collectively "NOAA") and the U.S. Environmental Protection Agency ("EPA") for violations of the Coastal Zone Act Reauthorization Amendments of 1990

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

("CZARA") and the Clean Water Act ("CWA").  These statutes encourage or require states to develop programs to manage nonpoint source pollution to protect water quality.  Nonpoint source pollution is precipitation runoff that moves over the ground, carrying away pollutants and depositing them into lakes, rivers, wetlands, and other waters.  These statutes also require EPA and NOAA to review state programs and to withhold certain federal grant funds from states that fail to develop and implement their programs in a complete and timely manner.

2.      Plaintiff Northwest Environmental Advocates ("Advocates") brings this action because although EPA and NOAA have repeatedly found that Washington has failed to submit an approvable coastal nonpoint pollution control program under CZARA, they have failed to disapprove Washington's program or to withhold the grant funds from Washington, as required. Additionally, EPA recently approved the nonpoint source program Washington developed under Section 319 of the CWA, allowing EPA to continue granting CWA funds to Washington even though Washington's program is plainly deficient under federal law.

3.      This action also alleges violations of the Endangered Species Act ("ESA").  The ESA requires federal agencies to consult with federal fish and wildlife agencies to insure that any action authorized, funded, or undertaken by the federal government does not jeopardize species protected by the ESA or destroy or adversely modify those species' critical habitats.  Here, although nonpoint source pollution adversely affects dozens of aquatic species protected by the ESA in Washington State, Defendants have never evaluated whether their approach to overseeing Washington's nonpoint source pollution control programs jeopardizes those species or adversely modifies their designated critical habitats.

4.      Defendants' actions and inactions with respect to Washington's nonpoint source programs subvert and render ineffective the statutes Congress adopted to protect water quality, aquatic species, and drinking water supplies from nonpoint sources of water pollution.  Plaintiff

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

therefore seeks a declaration that Defendants have violated these laws by failing to disapprove

Washington's programs, by failing to withhold grant funds from Washington as required, and by

failing to insure that federal oversight of Washington's programs—or the lack thereof—does not

threaten aquatic species in Washington.  Plaintiff also seeks a court order compelling Defendants

to comply with these laws and requiring Defendants to pay Plaintiff's costs and attorneys' fees.

## II.        JURISDICTION AND VENUE

5.        Plaintiff brings this action pursuant to the judicial review provisions of the

Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the citizen suit provisions of the

Endangered Species Act, 16 U.S.C. § 1540(g).  This Court has jurisdiction pursuant to 16 U.S.C.

§ 1540(g) and 28 U.S.C. § 1331 (federal question), § 2201 (declaratory judgment), and § 2202

(further relief).

6.        Venue is properly vested in this Court under 28 U.S.C. § 1391(e) and Local Civil

Rule 3(d)(1) because a substantial part of the events or omissions giving rise to Plaintiff's claims

occurred in Seattle, Washington and because Defendants' regional offices are located there.

## III.       PARTIES

7.        Plaintiff NORTHWEST ENVIRONMENTAL ADVOCATES is a non-profit

entity organized under Section 501(c)(3) of the Internal Revenue Code, with its principal place

of business in Portland, Oregon.  Founded in 1969, and incorporated in 1981, Advocates has

actively worked to protect and restore water quality and fish habitat in the Northwest for over

forty-five years.  Advocates employs community organizing, strategic partnerships, public

records requests, information sharing, public education, advocacy with administrative agencies,

lobbying, and litigation to ensure better implementation of the laws that preserve the natural

environment and protect water quality and wildlife.

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

8.      Advocates and its members reside near, visit, use, and/or enjoy rivers, streams, and other surface waters in Washington State, including waters in Washington's coastal areas. Advocates and its members regularly use and enjoy these waters and adjacent lands and have definite future plans to continue to use and enjoy these waters for recreational, subsistence, scientific, aesthetic, spiritual, commercial, educational, employment, conservation, and other purposes, including wildlife observation, study, and photography, and recreational and commercial fishing.  Advocates and its members derive benefits from their use and enjoyment of Washington's waters, especially waters in Washington's coastal areas, and therefore have a specific interest in the full and proper implementation of the laws passed to control water pollution and protect wildlife, such as the CWA, CZARA, and the ESA.  Advocates and its members would derive more benefits from their use of Washington's coastal waters if Defendants properly implemented the laws Congress adopted to reduce nonpoint source water pollution and to protect threatened species, and if farming, logging, and other sources of nonpoint source pollution were not adversely impacting water quality and native species of fish and wildlife.

9.      Some of Advocates' members are engaged in voluntary and employment-related efforts to protect ESA-listed species or to restore habitat, including water quality, for threatened and endangered fish and the birds and mammals that depend upon them.  These members' efforts are undermined by Defendants' failure to use the carrot-and-stick approach Congress adopted in CZARA and the CWA to control nonpoint source pollution in coastal and other watersheds. Defendants' failure to comply with the ESA also undermines and injures Advocates' members' habitat restoration and species protection activities.  Advocates' members' advocacy for improved regulation of nonpoint source activities, including for example, logging on the Olympic Peninsula and protection of riparian areas in agricultural lands in the Green-Duwamish

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

watershed, are undermined by Defendants' failure to hold the State of Washington accountable under CZARA, the CWA, and the ESA for inadequate logging and farming regulations and other land uses that adversely impact water quality. Advocates and its members have both substantive and procedural interests in complete implementation of environmental laws such as CZARA, the CWA, and the ESA.

10. The above-described interests of Advocates and its members have been, are being, and, unless this Court grants the relief prayed for herein, will continue to be adversely affected by Defendants' disregard of their statutory duties under CZARA, the CWA, and the ESA and by the unlawful harm imposed on water quality, fish and wildlife, and fish habitat that results. Defendants' failure to implement these statutes injures the interests of Advocates and its members. NOAA's failure to withhold the required amount of CZMA Section 306 funds, and EPA's failure to withhold the required amount of CWA Section 319 funds, has contributed to Washington's delay in meeting all conditions for final approval of its coastal nonpoint pollution control program ("Coastal Nonpoint Program") under CZARA. Additionally, EPA's improper approval of Washington's CWA Section 319 program and its improper grant of CWA Section 319 funds to Washington has contributed to Washington's maintaining a CWA program that does not protect water quality or aquatic species and that does not meet the requirements of the CWA. Both agencies' failure to comply with ESA Section 7 in authorizing and funding Washington's nonpoint source control programs has unlawfully caused and perpetuated adverse impacts to aquatic species that could have been avoided, reduced, or eliminated had the agencies complied with the ESA.

11. The relief requested in this lawsuit can redress these injuries. A court order requiring Defendants to comply with their procedural and substantive obligations under CZARA, the CWA, and the ESA would remedy Advocates' procedural injuries. Additionally, if this

COMPLAINT - 5

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

Court orders Defendants to comply with CZARA, CWA Section 319, and the ESA, Washington may improve its 319 plan and improve water quality in the state.  In turn, Plaintiff's members' injuries would likely be at least partially redressed by improved agricultural, logging, and other practices that are contributing nonpoint source water pollution to surface waters in Washington and impairing Advocates' members' interests.

12.     Defendants in this action are the U.S. DEPARTMENT OF COMMERCE, which Congress charged with implementing CZARA; the NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, which implements CZARA for the U.S. Department of Commerce; and the U.S. ENVIRONMENTAL PROTECTION AGENCY, which Congress charged with implementing CZARA and the CWA.

13.     The U.S. Department of Commerce, the National Oceanic and Atmospheric Administration, and the U.S. Environmental Protection Agency are agencies within the meaning of Administrative Procedure Act.  5 U.S.C. § 551.

## IV.     LEGAL BACKGROUND

A.     The Clean Water Act.

14.     In 1972, Congress adopted amendments to the CWA in an effort "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife[.]"  33 U.S.C. § 1251(a)(2).

15.     To accomplish that goal, the CWA requires states to develop water quality standards that establish the desired conditions of each waterway within the state's regulatory jurisdiction.  33 U.S.C. § 1313(a); 40 C.F.R. § 131.2.  Water quality standards must be sufficient to "protect the public health or welfare, enhance the quality of water, and serve the purposes of

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

[the CWA]." 33 U.S.C. § 1313(c)(2)(A).  Upon review and approval by EPA, a state's water

quality standards become a component of a state's regulatory scheme.

16.     The CWA requires states to review the quality of surface waters on a regular

basis.  If a state finds that waters do not meet applicable water quality standards, CWA Section

303(d) requires the state to add the waters to its list of impaired waters.  The CWA then requires

states to develop total maximum daily loads ("TMDLs") for all waters on its CWA Section

303(d) list.  A TMDL sets the allowable total daily loading of a pollutant for a particular

waterbody that, when achieved, will ensure the water attains and maintains the applicable water

quality standard.  33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. §§ 130.2(g)-(i), 130.7(c).  Water quality

standards and TMDLs are among the cornerstones of the CWA's pollution control measures.

17.     The CWA regulates "point sources" of pollution differently than it regulates

"nonpoint sources" of pollution.  To limit and control pollution from "point sources," which the

CWA defines as a "discernable, confined and discrete conveyance, including but not limited to

any pipe, ditch, channel, tunnel, conduit, [or] well . . . from which pollutants are or may be

discharged," 33 U.S.C. § 1362(14), the CWA established the National Pollutant Discharge

Elimination System ("NPDES") permit program.  In general, NPDES permits implement water

quality standards, and pollutant wasteload allocations set by TMDLs, by incorporating them into

effluent limitations and other permit conditions that limit the amount of pollution discharged.

18.     The CWA does not require NPDES permits for nonpoint sources of pollution;

instead, Section 319 of the CWA requires states to assess the quality of their waters and sources

of water quality impairment before developing nonpoint source management plans ("Section 319

Plans"), which are supposed to assist with meeting water quality standards and the goals of the

CWA.  33 U.S.C. § 1329(a), (b), (c)(2), (d).  Section 319 Plans must: (1) identify the best

management practices ("BMPs") the state will use to reduce pollution from nonpoint sources; (2)

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

identify the programs the state will use to implement those BMPs; (3) include an implementation schedule; (4) certify that state law authorizes the management programs; and (5) describe the funding available for the program.  33 U.S.C. § 1329(b)(2).

19.     Section 319(d)(1) of the CWA requires EPA to approve or disapprove all or a portion of a state's Section 319 Plan within 180 days of submission.  33 U.S.C. § 1329(d)(1).  If EPA finds a proposed plan is insufficient, EPA must notify the state of the revisions that are necessary to obtain approval and EPA and the state can then work toward final approval for the program.  33 U.S.C. § 1329(d)(2).

20.     After EPA approves its Section 319 Plan, a state may apply for federal grants to assist with implementation.  33 U.S.C. § 1329(h)(1).  State grant applications must include a description of the BMPs the state proposes to assist, encourage, or require for nonpoint sources for the year covered by the grant.  *Id*. at (h)(2).

21.     The CWA prohibits EPA from making grants to a state that has an approved Section 319 program, and that received a Section 319 grant in the preceding fiscal year, unless EPA finds that the state made "satisfactory progress" toward meeting the implementation schedule in its Section 319 Plan.  33 U.S.C. § 1329(h)(8).  The "satisfactory progress" finding— specifically, EPA's ability to withhold Section 319 grant funds from states that are not making satisfactory progress—is important because it is a means by which EPA can encourage states to implement their Section 319 Plans, including TMDLs, to protect water quality.

B.      The Coastal Zone Act Reauthorization Amendments of 1990.

22.     CZARA requires each state with an approved plan under the Coastal Zone Management Act ("CZMA")—at least 34 states and territories—to submit a Coastal Nonpoint Program to EPA and NOAA for approval.  16 U.S.C. § 1455b(a)(1).  The purpose of the program

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

is "to develop and implement management measures for nonpoint source pollution to restore and protect coastal waters, working in close conjunction with other State and local authorities." *Id.*

23.    CZARA requires state Coastal Nonpoint Programs to comply with certain statutory criteria and nonpoint source pollution control guidance published by EPA.  16 U.S.C. § 1455b(b) & (g).  As required by CZARA, 16 U.S.C. § 1455b(g), EPA, in consultation with NOAA, issued *Guidance Specifying Management Measures for Sources of Nonpoint Pollution in Coastal Waters* in January 1993 ("EPA's 1993 Guidance").  In that guidance, EPA set forth "management measures" to limit nonpoint source pollution and protect coastal waters from various nonpoint sources of pollution.  EPA's management measures address nonpoint source pollution from six primary areas: (1) agriculture; (2) urban runoff; (3) forestry; (4) marinas and boating; (5) channel modification, dams, and streambank and shoreline erosion; and (6) wetlands, riparian areas, and vegetated treatment systems.

24.    Where compliance with EPA's 1993 Guidance is not expected to achieve and maintain water quality standards and protect designated uses—those uses designated by states and approved by EPA under Section 303(c) of CWA, 33 U.S.C. § 1313(c)—CZARA requires states to develop and implement "additional management measures" as necessary to achieve and maintain applicable water quality standards.  16 U.S.C. § 1455b(b)(3).

25.    CZARA required states to submit their Coastal Nonpoint Programs to EPA and NOAA within 30 months of the publication of EPA's 1993 Guidance—*i.e.*, by July 1995—and required EPA and NOAA to review state programs within six months of submittal.  16 U.S.C. §§ 1455b(a)(1), 1455b(c)(1).

26.    EPA and NOAA must approve a state's Coastal Nonpoint Program if the agencies determine that the portions of the program under their respective authorities meet the requirements of the Act.  *Id.*  In practice, EPA and NOAA coordinate their review of Coastal

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

Nonpoint Programs; neither agency will approve a state's program until it meets all federal

approval requirements as determined by both agencies.  Once approved, states are required to

implement their Coastal Nonpoint Programs through changes to their Section 319 Plans and

coastal zone management programs.  16 U.S.C. §§ 1455b(a)(2), (c)(2).

27.    CZARA requires NOAA to withhold a portion of CZMA Section 306 grant funds

from a state if it finds under CZARA that the state has failed to submit an approvable Coastal

Nonpoint Program.  Similarly, CZARA requires EPA to withhold a portion of CWA Section 319

grant funds from a state if EPA finds that the state has failed to submit an approvable program.

16 U.S.C. § 1455b(c)(3) and (4).  CZARA required EPA and NOAA to begin withholding the

grant funds beginning in 1996.  *Id*. at § 1455b(c)(3)(D) and (4)(D).

C.    EPA's and NOAA's "Conditional Approval" Policy.

28.    EPA and NOAA have indefinitely delayed withholding CWA and CZMA grant

funds from Washington and other states that failed to submit approvable Coastal Nonpoint

Programs.  EPA and NOAA accomplished that delay through their conditional approval policy.

In general, where a state submits a Coastal Nonpoint Program that does not meet the applicable

criteria, EPA and NOAA note deficiencies in the program—they find the state has not submitted

an approvable program—and they identify conditions that need to be satisfied before the state

can obtain full program approval.  EPA and NOAA then "conditionally approve" the deficient

program and continue *full* CWA and CZMA funding pending completion of the conditions and

final program approval.

29.    The agencies' conditional approval policy established "one schedule for all

coastal nonpoint programs" and scheduled for 2001 the withholding of grant funds from states

without final program approval.  On October 16, 1998, EPA and NOAA issued *Final*

*Administrative Changes to the Coastal Nonpoint Pollution Control Program Guidance for*

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

*Section 6217 of the Coastal Zone Act Reauthorization Amendments of 1990* ("Final Administrative Changes").  There, the agencies reiterated that the timeframes for conditional approval would remain the same as those specified in the agencies' March 16, 1995 Flexibility Policy, *e.g.*, up to five years after conditional approval to meet conditions, with an evaluation of progress after three years.

30.     In the 1998 Final Administrative Changes guidance, EPA and NOAA also set out their expectations that actual pollution controls for "all individually and cumulatively significant nonpoint source categories and all watersheds within the §6217 management area will be addressed within 15 years."  The guidance further required states to submit a 15-year program strategy that would include, *inter alia*,

> a basis for determining whether [a state's] program will succeed in ensuring implementation within the 15 year implementation period (e.g., implementation rates); and, a process whereby the state will determine the need to use a backup authority and/or adopt additional enforceable policies and mechanisms to ensure implementation of the management measures within 15 years.

31.     EPA and NOAA initially "conditionally approved" all states' Coastal Nonpoint Programs.  EPA and NOAA did not issue any final decision disapproving a state's Coastal Nonpoint Program until 2015, when, because of litigation brought by Plaintiff, EPA and NOAA disapproved Oregon's Coastal Nonpoint Program and subsequently withheld some federal grant funding from Oregon.

32.     When EPA and NOAA are prepared to approve a state Coastal Nonpoint Program, they develop a Full Approval Decision Memorandum, publish a notice of intent to approve in the Federal Register, and open a public comment period so the agencies can learn the views of the public before making their final decision.  Under EPA's and NOAA's conditional approval policy, states receive full approval for their Coastal Nonpoint Programs only after they have satisfied all the conditions imposed on their program by EPA and NOAA.

COMPLAINT - 11

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

D.      The Endangered Species Act.

33.      Congress enacted the Endangered Species Act "to provide a means whereby the

ecosystems upon which endangered species and threatened species depend may be conserved ...

[and] to provide a program for the conservation of such endangered species and threatened

species[.]"  16 U.S.C. § 1531(b).

34.      Section 4(a) and 4(c) of the ESA, 16 U.S.C. § 1533(a) and (c), require the federal

agencies that implement the ESA to determine whether any species is "threatened" or

"endangered" and, if so, to list that species as being subject to the protections of the ESA.

Section 4(a)(3) of the Act, 16 U.S.C. § 1533(a)(3), then requires the federal agencies that

implement the ESA to designate critical habitat for species listed as threatened or endangered.

35.      Section 9 of the ESA makes it unlawful for any person to "take" an endangered

species of fish or wildlife.  16 U.S.C. § 1538(a)(1)(B).  All "persons," including any "any officer,

employee, agent, department, or instrumentality of the Federal Government" are subject to the

ESA's take prohibition.  16 U.S.C. § 1532(13).

36.      In addition to the take prohibition, Section 7(a)(2) of the ESA requires federal

agencies to evaluate expected impacts to listed species and designated critical habitat before

authorizing, funding, or taking any discretionary action.  16 U.S.C. § 1536(a)(2).  For freshwater

aquatic species, the ESA requires federal agencies to consult with the U.S. Fish and Wildlife

Service ("FWS").  For marine or oceangoing species such as salmon and steelhead, the ESA

requires federal agencies to consult with the National Marine Fisheries Service ("NMFS").

37.      FWS or NMFS must prepare a biological opinion if a proposed agency action is

likely to adversely affect a listed species.  FWS and NMFS must base their biological opinions

on the best available science and must analyze whether the proposed agency action is likely to

jeopardize any listed species or adversely modify any designated critical habitat.  16 U.S.C. §

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

1536(a)(2).  If a proposed agency action will jeopardize a listed species or adversely modify designated critical habitat, FWS or NMFS must suggest reasonable and prudent alternatives that will avoid those outcomes.  16 U.S.C. § 1536(b)(3)(A).

38.     The consulting agency—FWS or NMFS, as the case may be—must issue an incidental take statement to the action agency if after consultation it concludes the proposed action will result in take of listed species but is not likely to jeopardize a listed species or adversely modify critical habitat.  16 U.S.C. § 1536(b)(4).  Incidental take statements authorize the incidental take of listed species that will occur as a result of the action agency's proposed action.  They also limit the allowed level of incidental take and impose terms and conditions on the proposed action.  16 U.S.C. § 1536(b)(4)(C)(iv).  If, when implemented, the action exceeds the level of authorized take, the action agency, FWS, or NMFS must reinitiate consultation under Section 7(a)(2) of the ESA.  50 C.F.R. § 402.16.

## V.     FACTUAL BACKGROUND

A.     <u>Nonpoint Source Pollution Is A Serious and Widespread Problem in Washington.</u>

39.     Nonpoint source pollution dominates as the cause of water quality impairments throughout the United States.  The most recent CWA Section 305(b) data estimate that 53 percent of the nation's assessed rivers and streams, 66 percent of the nation's estuaries and bays, and 69 percent of the nation's lakes are water quality impaired, meaning they fail to meet water quality standards.  EPA estimates that more than half the waters on state CWA Section 303(d) lists of impaired waters are impacted primarily by nonpoint sources of pollution.

40.     Washington's waters are no different. As of 2008, 80 percent of the 2.8 percent of Washington's total 70,439 miles of rivers and streams that have been assessed, were found to be impaired.  Of 376 square miles of ocean and near coastal waters, 53 percent are impaired.

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

B.      Nonpoint Source Pollution Adversely Impacts Aquatic Species in Washington.

41.     The coastal waters of Washington State serve as habitat for, and provide food for, numerous threatened and endangered species listed under the ESA.  NMFS listed the Upper Columbia River spring Chinook salmon under the ESA in 1999.  Puget Sound Chinook, Lower Columbia River Coho, Hood Canal summer chum salmon, Columbia River chum, Snake River and Lake Ozette sockeye, and Puget Sound steelhead were all listed under the ESA in 2005. NMFS then designated critical habitat for many species of West Coast salmonids, including Puget Sound Chinook, Upper Columbia Chinook, Hood Canal summer chum salmon, Snake River and Lake Ozette sockeye, and Upper Columbia steelhead.  Upper Columbia River Steelhead was listed under the ESA as a threatened species in 2009.  NMFS also listed as threatened under the ESA the southern distinct population segment ("DPS") of Pacific eulachon (*Thaleichthys pacificus*), commonly known as smelt.  Subsequently, NMFS designated critical habitat for eulachon in Washington, Oregon, and California.  In 2010, NMFS listed the Puget Sound/Georgia Basin DPS of yelloweye rockfish and canary rockfish as threatened, and bocaccio as endangered, under the ESA.  Additionally, NMFS listed the Southern Resident killer whale (orca) DPS as an endangered species in 2005, with critical habitat designated in 2006.

42.     Water quality that supports all life cycle stages is necessary for the survival and recovery of these ESA-listed species that depend on Washington's fresh, marine, and brackish waters.

43.     Water pollution has a wide range of harmful effects on these species.  Nonpoint pollution can impact coastal ecosystems through excess concentrations of nutrients from runoff, which can result in eutrophication, a leading cause of algal blooms, some of them toxic.  When the nutrients run out, the algae die and sink to the bottom where they decompose, making anoxic zones uninhabitable for many fishes and invertebrates and lowering the overall dissolved oxygen

COMPLAINT - 14

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

levels that are needed to support aquatic life.  High levels of nutrient pollution can also alter the marine food web, for example by creating conditions conducive to jellyfish and deleterious to forage fish, such as Pacific herring, upon which threatened and endangered species rely.  Alteration of natural temperature regimes is caused by a range of nonpoint sources, also with the effect of depressing dissolved oxygen levels as well as raising temperatures beyond tolerances of cold-water species, such as threatened and endangered salmonids.  Beyond lack of streamside shading, temperatures are increased by sedimentation of streams that makes them more shallow.  This sediment, from nonpoint sources, also affects aquatic life directly and by carrying toxic pollutants into the environment.

44.     Urban runoff often contains metal contaminants, which threaten aquatic life and persist in the sediments of coastal habitats.  Metal contaminants can become available to marine organisms through uptake by wetland vegetation, adsorption by adjacent sediments, directly through the water column, or ingestion of sediment and bioaccumulation in coastal ecosystems.  Pesticides, from nonpoint sources such as logging, farming, and urban development, can adversely affect coastal and estuarine ecosystems through indirect impairment of the productivity of aquatic ecosystems and the loss or degradation of habitat that provides physical shelter for fish and invertebrates.  Runoff from all land-disturbing activities also carries the deposits from air pollution sources into water, from nitrogen produced by industrial and vehicle emissions to toxic chemicals, such as mercury. The process of biomagnification increases the contamination levels of species at the highest levels in the food chain.

45.     At the top of the food chain in Washington's marine waters are the Southern Resident killer whales.  NMFS has identified high levels of toxic polychlorinated biphenyls ("PCBs") in Southern Resident killer whales as one among many chemical compounds that have the same ability to induce immune suppression, impair reproduction, and cause other

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

physiological effects in the species.  Organochlorines—including PCBs, DDT, other pesticides, dioxins, and furans—are frequently considered to pose the greatest risk to killer whales.  In addition, increasing and high levels of so-called "emerging contaminants," such as polybrominated diphenyl ethers (flame retardants), that have similar negative effects, have been found in killer whales, and are not yet directly regulated under the CWA.  Bioaccumulation through trophic transfer (*i.e.*, up the food chain) allows concentrations of these compounds to build up in top-level marine predators, such as orca, where these highly fat-soluble pollutants accumulate in fatty tissues.  According to NMFS, the orca's position atop the food web, their long life expectancy, and the fact that they consume other mammals make them especially vulnerable to water pollution.  Heavy metals, including particularly mercury, cadmium, and lead, are also recognized as problematic.  While toxic contaminants are often passed on to future generations, metals are not.

46.     Orca rely on other ESA-listed species as prey.  Therefore, toxic contamination in, for example, Puget Sound Chinook salmon and yelloweye rockfish, pose a threat to the orca as well as to the chinook and rockfish themselves.  NMFS' 2008 Killer Whale Recovery Plan concluded that "pollutants originating within Puget Sound and the Georgia Basin probably play a greater role" in orca contamination than sources outside these areas, a "pattern [that] is apparent in Chinook salmon with longer residency periods in Puget Sound[.]"

47.     Other water quality parameters also affect fish species, such as temperature and low dissolved oxygen, and make these species more vulnerable to extinction and reduce their role as prey for orcas.  Temperature, in particular, is a function primarily of nonpoint source pollution.  For example, NMFS' recovery plan for Puget Sound salmonids found that "high water temperatures and low streamflows in the late summer and early fall are unfavorable for salmonids south of northern British Columbia."  Similarly, NMFS' five-year status review for

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

Puget Sound Chinook and other species concluded that higher water temperatures contribute to the outbreak and spread of diseases in salmon.  The effects of other pollutants that contribute to degraded water quality, such as toxic contaminants, pesticides, and excess sediment constitute a threat to habitat that limits recovery of Puget Sound Chinook and other salmonids.

C.    Regulatory Agencies Are Unwilling to Address Nonpoint Source Pollution.

48.    On July 14, 2011, western Washington Indian tribes issued a call to action—a white paper entitled *Treaty Rights at Risk: Ongoing Habitat Loss, the Decline of the Salmon Resource, and Recommendations for Change*—that raised concerns about the federal government's ability to protect water quality and salmon habitat in Washington State.  In May 2012, fourteen federal agencies—including EPA and NOAA—responded with a pledge to coordinate their programs and funding, prioritize protection and restoration of certain habitats and water quality, and report their progress regularly to address the tribes' concerns.

49.    Despite that pledge, EPA and NOAA have failed to comply with the very water quality laws that could address the longstanding problems summarized in the tribal white paper. Instead, and ironically, on April 23, 2013, EPA and NOAA notified the Washington Department of Ecology ("Ecology") that the ongoing federal response to the Treaty Rights at Risk *precluded* their making a decision about the approvability of Washington's Coastal Nonpoint Program. EPA and NOAA were concerned about declining fish populations across Washington, particularly in Puget Sound, and the adverse impacts of significant water quality problems. Based on those concerns, EPA and NOAA asked Washington to respond to the tribes' concerns by identifying, revising, and implementing Additional Management Measures under CZARA; by updating its Section 319 Plan to protect salmon habitat; and by placing conditions on federal funds that Ecology redistributes to others.

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

50.     EPA's and NOAA's response to the Treaty Rights at Risk white paper is emblematic of the agencies' approach to nonpoint source pollution problems in Washington State:  instead of performing their duties under CZARA and the CWA, as Congress directed, the agencies instead handed off the problem to the very state agencies that have failed *for decades* to solve the problem.  Specifically, although EPA and NOAA have identified numerous flaws in Washington's Coastal Nonpoint Program, the agencies have failed to make a final decision disapproving that program and failed to withhold CZMA and CWA grant funds from Washington, as required.  Additionally, although Washington's Section 319 Plan does not meet CWA requirements because, among other things, it does not contain BMPs for agriculture or a schedule for implementing them, EPA recently approved Washington's Section 319 Plan and found that Washington made "satisfactory progress" in meeting the schedule for implementing BMPs.  EPA's and NOAA's recent actions reflect a long-standing approach that has failed to protect water quality in Washington State.

D.     Washington's CWA Section 319 Plan.

51.     In October 1989, EPA completed its initial approval of Washington's first CWA Section 319 *Nonpoint Source Water Quality Assessment and Management Program*.  EPA noted that "[a]griculture, particularly animal keeping, has a greater impact on rivers than any of the other major nonpoint source categories."

52.     When, over 25 years later, Ecology issued a new draft Nonpoint Plan in May 2015, EPA instructed the state to identify mechanisms that would be used to implement BMPs developed for agriculture and how those BMPs would achieve and maintain water quality standards, with a clearly-described timeline.  In its final Section 319 Plan issued in July 2015, Ecology agreed to design a process with which to develop BMP guidance for agriculture to meet both CWA Section 319 and CZARA.  Washington's Section 319 Plan neither commits to using

COMPLAINT - 18

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

1    the process to develop or implement BMPs nor identifies any actual BMPs.  Notwithstanding

2    EPA's observation that the "[l]ack of BMPs for agricultural pollution and the absence of

3    measurable goals and milestones were specific concerns raised by both the EPA and many

4    Washington Tribes," EPA approved Washington's Section 319 Plan on August 21, 2015.

5           53.    On September 15, 2015, EPA determined that Ecology's 2014 Annual Report

6    demonstrated that the state had made "satisfactory progress" pursuant to CWA Section

7    319(h)(8), 33 U.S.C. § 1329(h)(8).  EPA also reminded Ecology that its Section 319 Plan's

8    process for developing agricultural BMPs designed to meet water quality standards was key to

9    the state's having an approvable Coastal Nonpoint Program under CZARA while noting that the

10   Section 319 Plan did not contain a "final strategy for satisfying CZARA requirements."  By letter

11   dated July 26, 2016, EPA also found that Washington made "satisfactory progress" in

12   implementing its Section 319 Plan during 2015 even while noting that Washington did not have

13   agricultural BMPs in place to protect water quality.

14          E.     Washington's Coastal Nonpoint Program.

15          54.    On September 29, 1995, Washington submitted its Coastal Nonpoint Program to

16   EPA and NOAA for review under CZARA.  Washington is subject to CZARA because it has a

17   federally-approved Coastal Zone Management Program.  Since its initial submission,

18   Washington has periodically submitted additional and/or revised program elements to EPA and

19   NOAA, including on the following dates: June 28, 1996; January 25, 1999; December 21, 1999;

20   April 3, 2003; May 6, 2004; and December 23, 2004.

21          55.    EPA and NOAA have not approved Washington's Coastal Nonpoint Program.

22   Instead, EPA and NOAA have repeatedly found that Washington failed to submit an approvable

23   Coastal Nonpoint Program and instead conditionally approved Washington's program.  In doing

24   so, EPA and NOAA repeatedly noted that a final decision approving or disapproving

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

Washington's Coastal Nonpoint Program would require public notice, and an opportunity for the public to comment, and that "final decisions may be subject to Tribal and [Endangered Species Act] consultation."

56.     EPA and NOAA issued their first findings on Washington's Coastal Nonpoint Program on June 30, 1998.  At that time, EPA and NOAA conditionally approved Washington's Coastal Nonpoint Program based on their assessment that Washington had met 14 of the required management measures.  In their 1998 findings, EPA and NOAA gave Washington three years to include in its program management measures in conformity with CZARA's management measures and one year to demonstrate "a strategy . . . to implement the management measures throughout [Washington's coastal] area."

57.     In their initial 1998 CZARA findings, EPA and NOAA found that Washington had not submitted a program of Additional Management Measures needed to achieve and maintain water quality standards.  On September 21, 2000 and again, on December 8, 2003, EPA and NOAA found that Washington still had not met the Additional Management Measures requirement.  Indeed, Washington's program is deficient in failing to adequately address at least the following: critical coastal areas; agricultural and forestry nonpoint source pollution; pesticide pollution and its effect on water quality and designated uses; failing septic systems and urban stormwater runoff; and the effects of livestock and concentrated animal feeding operations.

**Critical Coastal Areas**

58.     CZARA requires coastal states to identify land uses that degrade impaired or threatened waters and to identify critical coastal areas to ensure proper application of Additional Management Measures.  16 U.S.C. § 1455b(b)(1), (2), (3).  In their 1998 CZARA findings, EPA and NOAA concluded that Washington had not submitted a program for critical coastal areas that included "a process for the identification of critical coastal areas adjacent to impaired and

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

threatened coastal waters." On December 8, 2003, EPA and NOAA tentatively concluded that Washington had met this condition by identifying three types of areas as critical coastal areas, including those where TMDLs would be developed pursuant to CWA Section 303(d). In doing so, the agencies relied on the terms of a legal settlement that required the development of 1,566 TMDLs—equivalent to the number of waters listed on Washington's 1996 CWA Section 303(d) list of impaired waters—by June 30, 2013.

59. As of March 2016, neither Washington nor EPA had completed TMDLs for all the waters listed on Washington's 1996 CWA Section 303(d) list. Moreover, since 2003, Washington's CWA Section 303(d) list has grown exponentially and the agencies have not completed TMDLs for all those impaired waters, either. In addition, EPA and NOAA have expressed concern about the extent and breadth of water quality monitoring to support Washington's identification of impaired waters, and they have found that Washington has failed to explain how it uses monitoring data to evaluate the effectiveness of nonpoint source management measures in meeting water quality standards and protecting beneficial uses.

## Agricultural Nonpoint Pollution

60. Agriculture is a dominant land use in the area subject to Washington's Coastal Nonpoint Program. In their 1998 findings, EPA and NOAA concluded the state lacked programs to ensure implementation of management measures for agriculture and gave the state three years in which to comply with CZARA. In 2000, and again in 2003, EPA and NOAA found fault with Washington's program to control agricultural nonpoint pollution.

61. In response, Washington again relied on its TMDL program. Ecology also relied on agreements with the Washington State Conservation Commission and most of the state's conservation districts to protect water quality in agricultural areas. Several conservation districts have since repudiated the agreements, including the Whatcom, Whidbey Island, and Pacific

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

1    Conservation Districts, all of which are in the area subject to Washington's Coastal Nonpoint

2    Program.

3        62.    Riparian buffers on Washington agricultural lands are inadequate to protect water

4    quality and demonstrate part of the problem with Washington's Coastal Nonpoint Program.  On

5    January 20, 2013, NMFS sent a letter to EPA and the U.S. National Resources Conservation

6    Service ("NRCS") establishing the riparian buffers on agricultural lands that are necessary to

7    protect and recover threatened and endangered salmonids and concurring in the Washington

8    Department of Ecology's conclusion that existing standards, previously set by NRCS and

9    generally used on agricultural lands, are inadequate.  In March 2014, however, the Washington

10   Association of Conservation Districts adopted Resolution No. 2013-04, seeking to "assure that

11   all [riparian] buffers installed at the current width requirement be considered in full compliance

12   of the [Department of Ecology] requirements for acceptable conservation levels and would be

13   grandfathered in as continuing to be in full compliance."

14

15                              **Forestry Nonpoint Pollution**

16       63.    Forestry is a dominant land use in the area subject to Washington's Coastal

17   Nonpoint Program. In their 1998 findings, EPA and NOAA pointed to "[t]he need to improve

18   Washington's forestry program to protect water quality and beneficial uses [that] has been

19   documented by Federal and state agencies."  The 1998 findings also noted that "inadequate

20   riparian width prescriptions have resulted in detrimental changes in the temperature regime of

21   streams, and streamside management zones are not wide enough to prevent water quality

22   standard violations due to aerial applications of pesticides."  EPA and NOAA therefore

23   concluded that Additional Management Measures were required for critical coastal areas with

24   logging activities.

25

26

27

28

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

64.     Although Washington's Additional Management Measures rest largely on its TMDL program, in 1999 Washington signed a 10-year agreement called "Clean Water Act Assurances" that allowed Ecology to postpone indefinitely the development of TMDLs to address forestry-related water pollution.  In 2003, EPA and NOAA recommended that by February 2004 Washington complete an evaluation of whether existing forest practices were sufficient to meet water quality standards.  And by July 15, 2009, Ecology had found that there was insufficient information to draw any conclusions but decided to defer development of TMDLs for logging-related pollution for another 10 years, to 2019.  Then in its 2014 *Annual 319 Plan*, Ecology reported on the status of the Clean Water Act Assurances Milestones. Among actions not completed or "off track" was a 2010 milestone to examine the effectiveness of the Type N (non-fish bearing) logging rules to protect water quality and to assess the progress of bringing logging roads into compliance with best practices.  In short, Washington cannot rely on its TMDL program to satisfy the Additional Management Measures for forestry because Washington has indefinitely deferred conducting TMDLs for streams impacted by logging and related practices.

### Pesticides and Threatened and Endangered Species

65.     Washington has no Additional Management Measures that protect water quality and designated uses from pesticides.  In seven biological opinions issued between November 2008 and January 2015 pursuant to Section 7(a) of the ESA, NMFS found that certain pesticides used according to EPA-approved labels jeopardize the continued existence of threatened and endangered salmonid species and/or result in the destruction or adverse modification of their designated critical habitat in Washington.  Similarly, after consulting on EPA's national Pesticide General Permit, which covers pesticide applications on federal facilities and tribal lands in Washington State, NMFS identified the presence of at least one threatened or

COMPLAINT - 23

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

1   endangered species in 33 of Washington's counties for which discharges of pesticides without

2   additional mitigating measures would either jeopardize the species or adversely modify its

3   critical habitat.  EPA has not incorporated the mandatory reasonable and prudent alternatives

4   from these opinions into its licensing and labeling requirements under the Federal Insecticide,

5   Fungicide, and Rodenticide Act ("FIFRA"), nor does Washington have regulations that comply

6   with the opinions.

7

**Urban Stormwater Runoff**

8       66.     Ecology considers stormwater runoff to be the "Number 1 water pollution

9   problem" in Washington's urban areas.  Stormwater is precipitation that flows over impervious

10  surfaces causing changes in hydrology and water quality.  It often contains pollutants such as oil

11  and grease, nutrients and bacteria from failed septic systems and pet wastes, sediment, lawn

12  fertilizers, and chemicals and pesticides from vehicles, gardens, and roofs.  Such stormwater is

13  highly toxic to threatened and endangered salmonids, disrupting feeding, interfering with

14  predator avoidance, suppressing the immune system, and depressing growth rates of juveniles.

15      67.     In 2002, EPA and NOAA issued guidance discussing the overlap between the

16  Coastal Nonpoint Programs required by CZARA and EPA's Phase I and II stormwater

17  regulations, which require NPDES permits for many point source discharges of stormwater.

18  While urban stormwater subject to NPDES permitting is excluded from CZARA requirements,

19  all other stormwater—including stormwater runoff associated with watershed protection, site

20  development, new and operating onsite disposal systems, pollution prevention efforts, and the

21  planning, siting and development of roads and bridges—remains subject to state Coastal

22  Nonpoint Programs.

23      68.     Washington's Coastal Nonpoint Program is woefully deficient in addressing

24  urban stormwater.  It relies on Washington's Puget Sound Water Quality Management Plan,

COMPLAINT - 24

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

which directs all non-NPDES permitted local governments in western Washington to adopt the Stormwater Management Manual for Western Washington; however, the stormwater manual is neither enforceable nor applicable outside the Puget Sound area.

### Failing Septic Systems

69.     Septic systems serve approximately 1.4 million suburban and rural Washingtonians.  Failing septic systems can contaminate surface waters with bacteria, viruses, and other pollutants, thereby contaminating fish and shellfish, making water unsafe for swimming and drinking, and leading to fishing, shellfishing, and beach closures.  In addition, conventional septic systems are not designed to remove nitrogen, which contributes to low levels of dissolved oxygen in Puget Sound.

### Livestock and Concentrated Animal Feeding Operations

70.     Livestock are a significant source of nonpoint source pollution.  As of 2014, Washington had 388 registered commercial cow dairies comprised of 102 large dairies, 134 medium dairies, and 152 small dairy farms, many of which are in Whatcom and Yakima counties.

71.     Livestock near surface waters causes contamination from manure, low dissolved oxygen levels caused by nutrient and sediment loading, increased temperatures from loss of streamside vegetation and the widening and shallowing of streams, increased turbidity and suspended solids from erosion and sediment runoff, and changes in pH caused by erosion.

72.     Ecology considers many of Washington's dairies to be nonpoint sources of pollution, but it has few if any provisions for reducing nonpoint source pollution from dairies. The Washington legislature moved regulation of the dairy program from Ecology to the Washington State Department of Agriculture on July 1, 2003 through passage of the Dairy Nutrient Management Act.  Subsequently, in 2010, Ecology prepared a draft manual of BMPs

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

1  for livestock, but never finalized it. Since then, water quality data from the Nooksack watershed

2  has demonstrated a marked increase in bacterial pollution found in waters, demonstrating the

3  water quality effects of this regulatory change.

4        F.    Despite The Serious And Widespread Harm Caused by Nonpoint Source Water
5              Pollution, EPA and NOAA Have Failed to Perform Their Mandatory Duties
              Under CZARA, The CWA, and The ESA.
6

7        73.    Notwithstanding the obvious deficiencies in Washington's Coastal Nonpoint

8  Program, EPA and NOAA have not issued a final decision approving or disapproving

9  Washington's Coastal Nonpoint Program, as required by CZARA.

10       74.    Notwithstanding the obvious deficiencies in Washington's Coastal Nonpoint

11 Program, since 1998 EPA has not withheld from Washington the portions of CWA Section 319

12 funds required by 16 U.S.C. § 1455b(c)(4).  Between 2004 and 2016, EPA instead awarded

13 Washington approximately $45,925,000 in CWA Section 319 funds.

14       75.    Notwithstanding the obvious deficiencies in Washington's Coastal Nonpoint

15 Program, since 1998 NOAA has not withheld from Washington the portions of CZMA Section

16 306 grant funds required by 16 U.S.C. § 1455b(c)(3).  Between 1998 and 2016, NOAA instead

17 awarded Washington approximately $38,576,000 in CZMA Section 306 funds.

18       76.    EPA's failure to withhold the required amount of CWA Section 319 funds from

19 Washington, and NOAA's failure to withhold the required amount of CZMA Section 306 funds

20 from Washington, has contributed to Washington's delay in meeting all conditions for final

21 approval of its Coastal Nonpoint Program.

22       77.    EPA and NOAA acknowledge that nonpoint source pollution in Washington has

23 widespread and adverse impacts on aquatic species listed under the ESA.  And EPA and NOAA

24 exercised their discretion in conditionally approving Washington's Coastal Nonpoint Program.

25 Notwithstanding those facts, EPA and NOAA have never consulted under Section 7(a)(2) of the

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

ESA to determine whether the conditional approval and continued funding of Washington's

Coastal Nonpoint Program jeopardizes listed species or adversely modifies designated critical

habitat.

78.     Similarly, even though EPA exercised its discretion in approving Washington's

Section 319 Plan, and in finding that Washington had made "satisfactory progress" in

implementing that plan, EPA has never consulted under Section 7(a)(2) of the ESA to determine

whether those decisions jeopardize listed species or adversely modify designated critical habitat.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### (Against all Defendants)

Violation of 16 U.S.C. § 1455b and the Administrative Procedure Act:
Failure to Finally Approve or Disapprove Washington's Program

79.     Plaintiff hereby incorporates by reference all of the preceding paragraphs.

80.     CZARA requires EPA and NOAA to disapprove a state's Coastal Nonpoint

Program if it does not meet applicable criteria and guidance.

81.     EPA and NOAA have not issued a final decision approving or disapproving

Washington's Coastal Nonpoint Program. A final decision approving or disapproving

Washington 's Coastal Nonpoint Program is final agency action that can be compelled under the

APA, 5 U.S.C. § 706(1).

82.     Defendants' failure to issue a final decision approving or disapproving

Washington's Coastal Nonpoint Program constitutes agency action unlawfully withheld or

unreasonably delayed within the meaning of the APA.

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

SECOND CLAIM FOR RELIEF

(Against the U.S. Department of Commerce and
the National Oceanic and Atmospheric Administration)

Violation of 16 U.S.C. § 1455b(c)(3) and the Administrative Procedure Act:
NOAA's Failure to Withhold the Required Portions of CZMA Grant funds

83.     Plaintiff hereby incorporates by reference all of the preceding paragraphs.

84.     NOAA has found that Washington failed to submit an approvable Coastal Nonpoint Program.  Nonetheless, NOAA has failed to withhold CZMA grant funds from Washington as required by CZARA, 16 U.S.C. § 1455b(c)(3).  Unless relief is granted in this lawsuit, NOAA will continue failing to withhold the required portions of CZMA grant funds from Washington, in violation of 16 U.S.C. § 1455b(c)(3).

85.     The withholding of CZMA grant funds is final agency action that can be compelled under the APA, 5 U.S.C. § 706(1).

86.     NOAA's failure to withhold CZMA grant funds as required by 16 U.S.C. § 1455b(c)(3) constitutes agency action unlawfully withheld or unreasonably delayed within the meaning of the APA.

87.     Alternatively, NOAA's 2011, 2012, 2013, 2014, 2015, and 2016 CZMA grants to Washington are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and otherwise in violation of the APA, 5 U.S.C. § 706(2), because among other things they do not comply with CZARA or defendants' policies.

THIRD CLAIM FOR RELIEF

(Against the U.S. Environmental Protection Agency)

Violation of 16 U.S.C. § 1455b(c)(4) and the Administrative Procedure Act:
EPA's Failure to Withhold the Required Portions of CWA Grant Funds

88.     Plaintiff hereby incorporates by reference all of the preceding paragraphs.

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

89.     EPA has found that Washington failed to submit an approvable Coastal Nonpoint Program.  Nonetheless, EPA has failed to withhold CWA grant funds from Washington as required by CZARA, 16 U.S.C. § 1455b(c)(4).  Unless relief is granted in this lawsuit, EPA will continue failing to withhold the required portions of CWA grant funds from Washington, in violation of 16 U.S.C. § 1455b(c)(4).

90.     The withholding of CWA grant funds is final agency action that can be compelled under the APA, 5 U.S.C. § 706(1).

91.     EPA's failure to withhold CWA grant funds as required by 16 U.S.C. § 1455b(c)(4) constitutes agency action unlawfully withheld or unreasonably delayed within the meaning of the APA.

92.     Alternatively, EPA's 2011, 2012, 2013, 2014, 2015, and 2016 CWA grants to Washington are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and otherwise in violation of the APA, 5 U.S.C. § 706(2), because among other things they do not comply with CZARA or defendants' policies.

FOURTH CLAIM FOR RELIEF

(Against the U.S. Environmental Protection Agency)

Violation of 33 U.S.C. § 1329(d) and the Administrative Procedure Act:
EPA's Arbitrary and Capricious Approval of Washington's Nonpoint Management Program

93.     Plaintiff hereby incorporates by reference all of the preceding paragraphs.

94.     Under CWA Section 319(b)(2), state nonpoint source management programs must include, *inter alia*, each of the following:

A.     an identification of the BMPs and measures to reduce pollutant loadings from each category and subcategory of nonpoint sources;

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

B.      an identification of the programs to achieve implementation of the BMPs; and

C.      a schedule containing annual milestones for utilization of the program implementation methods and implementation of the BMPs, which provides for utilization of the BMPs at the earliest practicable date. 33 U.S.C. § 1329(b)(2)(A), (B), (C).

95.      Washington's final *Water Quality Management Plan to Control Nonpoint Sources of Pollution* identifies how it will create a *process* to identify BMPs for agricultural nonpoint pollution, but does not identify BMPs by categories of nonpoint sources or programs to achieve implementation of any identified BMPs, as required by CWA Section 319(b)(2)(A), (B).

96.      Washington's final Section 319 Plan does not includes a schedule, containing annual milestones, that demonstrates it will utilize identified BMPs and program implementation methods, which together will provide for utilization of the BMPs at the earliest practicable date, as required under CWA Section 319(b)(2)(C).

97.      EPA approved Washington's final Section 319 Plan on August 21, 2015.

98.      EPA's approval of Washington's program is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

FIFTH CLAIM FOR RELIEF

(Against the U.S. Environmental Protection Agency)

Violation of 33 U.S.C. § 1329(h)(8) and the Administrative Procedure Act:
EPA's Arbitrary and Capricious Finding of "Satisfactory Progress"

99.      Plaintiff hereby incorporates by reference all of the preceding paragraphs.

100.      Upon approval of a state Section 319 Plan, EPA must make grants to assist the state in implementing its program. 33 U.S.C. § 1329(h)(1).

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

101.    EPA may not grant funds to implement a state's Section 319 Plan unless EPA has determined the state has made "satisfactory progress" in the preceding fiscal year in meeting the schedule for implementing BMPs and the programs to achieve their implementation, as required under CWA Section 319(b)(2)(C). 33 U.S.C. § 1329(h)(8).

102.    On September 15, 2015, EPA found, pursuant to 33 U.S.C. § 1329(h)(8), that Washington's 2014 Annual Report demonstrated that Ecology had made "satisfactory progress" in implementing Washington's Section 319 Plan during 2014.  On July 26, 2016, EPA found, pursuant to 33 U.S.C. § 1329(h)(8), that Ecology had made "satisfactory progress" in implementing Washington's Section 319 Plan during 2015.

103.    EPA's 2015 and 2016 satisfactory progress findings are arbitrary and capricious because, *inter alia*, EPA based its findings on Washington's 2015 Section 319 Plan, which contains no schedule for implementing BMPs and no identified BMPs.

104.    Notwithstanding 33 U.S.C. § 1329(h)(8), EPA awarded Section 319 grant funds to Washington in 2015 and 2016. Those grants to Washington are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and otherwise in violation of the APA, 5 U.S.C. § 706(2), because among other things they did not comply with the CWA.

SIXTH CLAIM FOR RELIEF

(Against all Defendants)

Violation of 16 U.S.C. § 1536(a)(2):
Failure to Consult on the EPA's and NOAA's Authorization and Funding of Washington's
Nonpoint Source Pollution Management Programs

105.    Plaintiff hereby incorporates by reference all of the preceding paragraphs.

106.    Section 7 of the ESA requires federal agencies to insure that any action they take, authorize or fund will not jeopardize any species listed as threatened or endangered under the ESA or destroy or adversely modify any critical habitat designated for such species.

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

Additionally, Section 7 of the ESA requires federal agencies to consult with the agencies that implement the ESA to ensure they are meeting their substantive obligations under Section 7 of the ESA.

107.    EPA and NOAA have violated ESA Section 7 by failing to consult on their decisions to fully fund and conditionally approve Washington's Coastal Nonpoint Program and by failing to insure that its conditional approval and full funding of Washington's Coastal Nonpoint Program will not jeopardize any listed species or destroy or adversely modify any designated critical habitat.

108.    Additionally, EPA has violated ESA Section 7 by failing to consult on its authorization and funding of Washington's CWA Section 319 Plan, and its related satisfactory progress findings, and by failing to insure that those decisions will not jeopardize any listed species or destroy or adversely modify any designated critical habitat.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare that EPA and NOAA have violated CZARA, 16 U.S.C. § 1455b, by unlawfully withholding or unreasonably delaying final approval or disapproval of Washington's Coastal Nonpoint Program;

B.    Order EPA and NOAA to finally approve or disapprove Washington's Coastal Nonpoint Program within ninety days of a judgment in this case;

C.    Declare that NOAA has violated CZARA, 16 U.S.C. § 1455b(c)(3), by failing to withhold, or unlawfully withholding or unreasonably delaying the withholding of, CZMA grant funds from Washington;

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

D.      Order NOAA to withhold the required portions of CZMA grant funds from Washington until EPA and NOAA find that Washington has submitted an approvable Coastal Nonpoint Program;

E.      Declare that EPA has violated CZARA, 16 U.S.C. § 1455b(c)(4), by failing to withhold, or unlawfully withholding or unreasonably delaying the withholding of, CWA grant funds from Washington;

F.      Order EPA to withhold the required portions of CWA grant funds from Washington until EPA and NOAA determine that Washington has submitted an approvable Coastal Nonpoint Program;

G.      Declare that EPA violated the CWA, 33 U.S.C. § 1329(b), in approving Washington's CWA Section 319 plan;

H.      Declare that EPA violated the CWA, 33 U.S.C. § 1329(h)(8), in concluding that Washington made satisfactory progress in the preceding fiscal year in meeting the schedule for implementing BMPs and the programs to achieve their implementation.

I.      Order EPA to withhold funds as required by 33 U.S.C. § 1329(h)(8) until Washington has made satisfactory progress based on an approved Section 319 Plan with a schedule to implement identified BMPs.

J.      Declare that EPA and NOAA have violated ESA Section 7 by failing to consult before authorizing or funding Washington's Coastal Nonpoint Program and Section 319 Plan.

K.      Order EPA and NOAA to complete ESA Section 7 consultation on their actions related to Washington's Coastal Nonpoint Program and Section 319 Plan.

L.      Declare, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, that Plaintiff is the prevailing party; that the position of the government in this action was not

Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
(503) 768-6894

substantially justified; and that there are no special circumstances that make an award of costs and reasonable attorneys' fees to Advocates unjust;

M.      Award Advocates its reasonable fees, expenses, costs, and disbursements, including attorneys' fees associated with this litigation, under the Equal Access to Justice Act, 28 U.S.C. § 2412, and Section 11 of the Endangered Species Act, 16 U.S.C. § 1540; and

N.      Grant Advocates such additional relief as the Court deems just and proper.

Respectfully submitted this 7th day of December 2016.

  s/Paul A. Kampmeier
Paul A. Kampmeier (WSBA #31560)
Kampmeier & Knutsen PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
Tel: (206) 223-4088 x 4
paul@kampmeierknutsen.com

  s/Allison LaPlante
Allison LaPlante (OSB 023614)
***Pro hac vice* application forthcoming**
Earthrise Law Center
Lewis & Clark Law School
10015 S.W. Terwilliger Blvd.
Portland, OR 97219
Tel: (503) 768-6894
laplante@lclark.edu

*Attorneys for Plaintiff Northwest Environmental Advocates*